26 C.C.P.A. (Patents)

## TEARS v. ROBINSON.
### Patent Appeal No. 4180.

Court of Customs and Patent Appeals.
June 26, 1939.

Philip S. McLean, of New York City, for appellant.

Donald E. Payne, of Chicago, Ill., for appellee.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges.

GARRETT, Presiding Judge.

We are here called upon to review the decision of the Board of Appeals of the United States Patent Office affirming the decision of the Examiner of Interferences awarding priority to the party Robinson in an interference proceeding involving three counts which read as follows:

"Count 1. The herein disclosed process of decolorizing viscous lubricating oil which comprises heating a mixture of viscous lubricating oil and liquefied normally gaseous hydrocarbon solvent to a temperature corresponding to a solvent vapor pressure in excess of 150 pounds per square inch under pressure sufficient to maintain said solvent in the liquid state and passing the heated mixture through a bed of adsorbent decolorizing clay under sufficient pressure to maintain the heated solution in the liquid state.

. "Count 2. The herein disclosed process of decolorizing viscous lubricating oil which comprises heating a mixture of viscous lubricating oil and liquefied propane solvent under pressure sufficient to maintain said solvent in the liquid state to a temperature corresponding to a solvent vapor pressure in excess of 150 pounds per square inch and passing the heated mixture through a bed of adsorbent decolorizing clay under sufficient pressure to maintain the heated solution in the liquid state.

"Count 3. The process of count 1, including the further steps of periodically interrupting the passage of the oil solution through the bed of adsorbent decolorizing clay and passing fresh liquefied normally

gaseous hydrocarbon solvent under pressure sufficient to maintain the solvent in the liquid state through the bed of adsorbent decolorizing clay during such periods of interrupted flow of oil solution."

The interference was declared between a patent, 2,067,802, issued to the party Tears January 12, 1937, upon an application filed July 5, 1933, and an application of Robinson, serial No. 597,889, filed March 10, 1932. All the counts originated in the Tears patent.

The sole question involved is the right of Robinson to make the counts, the issue having been presented by a motion on behalf of Tears to dissolve the interference after he had been placed under order to show cause why judgment upon the record should not be entered against him.

The Primary Examiner denied the motion to dissolve and the Examiner of Interferences entered judgment pro forma. Upon appeal the board reviewed the decision of the Primary Examiner and, agreeing therewith, affirmed the judgment order of the Examiner of Interferences. Tears filed a petition for rehearing which was denied and appeal to this court followed.

While the only question presented is whether Robinson's disclosure supports certain express limitations in the counts, determination of this has required the consideration of highly technical matters concerning which the arguments, of necessity, are quite technical in character. The tribunals of the Patent Office agreed as to all material phases of the case. Under such circumstances the burden rests heavily upon appellant to demonstrate clearly the error of the concurring decisions, the question presented being one of fact only.

It is noted that the brief for appellant states: "We believe that possibly the decision of the Board of Appeals in favor of Robinson was the result of a failure on our part to fully acquaint the Board of Appeals with the technical details involved."

As to this we may say that, so far as we can determine, appellant's motion to dissolve was quite comprehensive and specific in stating the reasons upon which it was based, and it is certain that the discussion contained in his petition to the board for rehearing covered in detail, although in somewhat different phraseology, the various technical matters presented to us (with the exception of the operability of Robinson's process), the limitations relied on being italicized and argued at length. We feel quite confident that the board as well as the Primary Examiner (the Examiner of Interferences not having had occasion to consider the case on the merits) fully understood the issues and the position of appellant respecting them, and that such issues were considered by those tribunals in the light of their expert knowledge of the subject matter.

The Primary Examiner described the invention and the disclosures of the respective parties broadly as follows:

"The invention relates to a process of decolorizing viscous lubricating oil with clay, and more particularly the oil is first mixed with a normally gaseous hydrocarbon solvent at an elevated temperature under pressure sufficient to maintain said solvent in the liquid state. The disclosure of Tears relates to the use of propane as the preferred diluent or solvent, but other liquefiable gases may be used. The diluent in Tears at a temperature corresponding to a solvent vapor pressure in excess of 150 pounds per square inch is mixed with the oil and then the mixture is heated to cause complete solution and extreme dilution. The heated solution may be passed directly to the clay chamber or it may be first cooled to a temperature corresponding to a solvent vapor pressure of 150 pounds per square inch. The Tears disclosure also relates to the reactivation of clay by interrupting the passage of the oil solution through it while fresh liquefied normally gaseous hydrocarbon maintained in liquid form is passed through said clay. According to data submitted and made of record in the Tears patented file the temperature of liquefied propane corresponding to its vapors pressure of 150 pounds per square inch is about 85 degrees Fahrenheit.

"The Robinson disclosure relates to the treatment of a viscous oil with a diluent such as liquefied hydrocarbon gas of the nature of propane or butane. Robinson describes the treatment of a lubricating oil stock by first mixing it with propane at a pressure of about 50 to 200 pounds, depending upon the vapor pressure of the propane. The mixture is acid treated in a mixer wherein the temperature is preferably about 75 to 90° Fahrenheit which could be regulated by the use of heating or cooling coils. The mixture of acid, oil and propane is then passed into a reaction tank and kept there for a sufficient time to allow for complete reaction, then the sour

oil is separate from the sludge. The acid treated oil is then passed to clay contacting or percolating filters. Robinson describes the maintenance of temperatures of the order of 70° to 90° F. within the reaction tank by withdrawing vapors of propane from the top thereof. Robinson also discloses the reactivation of the clay beds by washing out the filters at intervals with propane and then treating with caustic alkali and a solvent mixture."

From appellant's brief we quote the following:

"The claims [counts] are limited to decolorizing lubricating oils in solution in a particular solvent, designated in count 1 as a liquefied normally gaseous hydrocarbon, and in count 2 as propane, a specific member of the general family of liquefied normally gaseous hydrocarbons. The whole group may be defined as hydrocarbon compounds which are gaseous in nature at ordinary atmospheric pressure and temperature but which can be liquefied by compression at atmospheric or higher temperatures or by refrigeration to subatmospheric temperatures under atmospheric pressure or by a combination of compression and refrigeration.

"The Tears patent mentions methane, ethane, ethylene, propane, propylene, butane, butylene and pentane as specific individual members of the family that may be used in this process. Of this group, the most desirable single solvent is propane, because it is readily available, can be liquefied under reasonable pressures and can be procured at reasonable prices. Propane is a saturated hydrocarbon of the Methane series with a formula of $C_3 H_8$.

"Tears introduces propane in his patent as follows:

" 'Propane, because of its availability, low cost and the fact that it can be maintained liquid at a pressure of around 150 lbs. at normal temperatures has been used most satisfactorily' (R. 69).

"Please note that this quotation is by way of definition and description of propane and has nothing to do with any operating conditions in the process described by Tears."

In the Tears patent file of record there is a document entitled "Pressure-Temperature Chart for Hydrocarbon Vapors" which consists of pages taken from Vol. 15, No. 6, June 23, 1923, of a publication entitled "Industrial and Engineering Chemistry." A chart was alluded to in the decision of the Primary Examiner. We find no specific reference to a chart in the decision of the board. The record also contains a document described in the brief on behalf of Tears as "a magnified portion of this chart showing the vapor pressure curves of propane, butane and pentane." This appears in the record on page 126A. It is referred to in appellant's petition for rehearing as having been "used by Tears at the hearing." We assume that it was meant by this that it was used at the hearing before the Primary Examiner but whether the Primary Examiner's reference to "the chart made of record in the file of Tears patent 2,067,802" was to this so-called "magnified portion," or to the chart itself, is not clear. The "magnified portion" is more than that term indicates in that it contains printed matter, not embraced in the chart itself, referring specifically to the patent and application here at issue. The accuracy of this "magnified portion" is challenged in the brief for Robinson at least to the extent that in a supplement thereto another chart is presented which is described as "a corrected copy of page 126A of the record."

The brief on behalf of Tears contains the statement, in substance, that in technical literature two different pressures are used; namely, "gauge pressure" and "absolute pressure"; that when pressure is stated in pounds per square inch it is "universally understood" that the unit is gauge pressure; that when absolute pressure is meant it is "always stated as 'Pressure in lbs. per sq. in absolute' or 'Absolute pres. lbs. Per Square Inch' as it appears on the chart"; that gauge pressure is converted to absolute pressure by adding approximately 15 pounds per square inch; that a gauge pressure of 150 pounds per square inch would approximate an absolute pressure of 165 pounds per square inch, and that to convert absolute pressure to gauge pressure the process is reversed and approximately 15 pounds is deducted from the absolute pressure.

The counts at issue require that the mixture of oil and the liquefied normally gaseous hydrocarbon solvent (count 2 being limited to propane as the solvent) be heated to a temperature in excess of 150 pounds per square inch, and it is the contention of Tears that this should be interpreted as meaning *gauge* pressure. Based upon this construction he directs attention to lines and curves shown upon the "mag-

nified portion" of the chart which are claimed to demonstrate that Robinson does not disclose a pressure *in excess* of 150 pounds per square inch, as the counts require.

The party Robinson responds that the counts do not call for gauge pressure; that nowhere in his patent does Tears refer to gauge pressure; that vapor pressures of solvents are not ordinarily referred to as gauge pressures; that the vapor pressure curves supplied to the Patent Office in the Tears file do not refer to gauge pressure; that there is no foundation whatever for reading the word "gauge" into the counts, and, in the chart supplied by Robinson for use in the argument, emphasis appears to be placed upon absolute pressure.

The use of charts, drawings, models and the like for the purpose of illustrating arguments of counsel is legitimate and proper, and we frequently find them quite helpful and always appreciate and encourage their use. When, however, their accuracy is questioned and nothing is disclosed in the record of an evidentiary nature from which accuracy can be determined such documents tend to confuse rather than aid.

Thus we are confronted here with a disputed question of a technical character concerning which there is no evidence in the record. Certain things are stated in the respective briefs as being factual, and arguments are based upon them with charts used as illustrative, the accuracy of both the facts stated and the charts used being challenged.

The situation is analogous to that which existed in the case of Pew, Jr. v. Gard et al., 97 F.2d 591, 594, 25 C.C.P.A. Patents 1326, where we said, inter alia:

"In this court, counsel for appellant has presented argumentative matter, technical in character, as a substitute for evidence in an effort to demonstrate that the Board of Appeals erred in holding that a pressure drop of 75 pounds at valve 63 in appellee Seguy's disclosure would be sufficient to dry the mixture of vapors passing to the vapor phase cracking chambers 22 'to the extent required to bring the temperature above the saturation point for the reduced pressure,' as stated in the counts.

\* \* \* \* \* \*

"We have heretofore called attention to the fact that counsel for appellant has submitted no evidence in support of his contention, but relies entirely upon arguments, technical in character, to demonstrate the correctness of his position. ·

"\* \* \* Counsel for appellant having failed to introduce any evidence on the subject, and as it does not appear to us from a consideration of the facts of record and the arguments of counsel that the Board of Appeals erred \* \* \* we must hold that appellee Seguy is entitled to make the claims constituting the counts in issue."

It seems to be the theory of the party Tears that the court may take judicial knowledge of the understanding in the art of the technical matters stated and argued in his brief. This was suggested during the oral argument before us and counsel for the parties were invited to furnish any authorities deemed to be in point. We have been supplied with definitions of pressure quoted from what are stated to be standard and well recognized authorities. Assuming, without deciding, that we might properly look to them, they have been examined but they are found to be conflicting and not clear in some material respects, and we do not feel justified in accepting them as establishing appellant's contentions. It must be borne in mind that Tears is the junior party here, and had the burden of establishing his case by a preponderance of the evidence.

It should be said further that Robinson does not concede that even if the word "gauge" be read into the counts his disclosure fails to support them. Upon the contrary, he argues: "However, even if gauge pressures were specified in the counts in issue Robinson would still have ample disclosure to meet this requirement because it is indisputable that a hydrocarbon which has a vapor pressure of 200 pounds at 100°F. will have a vapor pressure in excess of 150 pounds at 90°F. Robinson teaches the use at 90°F. of a hydrocarbon diluent which has a vapor pressure of 200 pounds at 100°F."

The contention of appellant that Robinson does not disclose gauge pressure in excess of 150 pounds per square inch seems to be based upon what is contended, in effect, to be a property of propane, appellant's preferred solvent or diluent. Appellant insists this means *pure* propane, thus arguing for the insertion of another limitation (pure) into the counts, or at least into count 2. It is pointed out that the specification of Robinson defines the pro-

pane proposed to be used by him "to mean commercial propane or mixtures of propane with butane, having a vapor pressure at 100°F. of about 50–200 pounds," and appellant insists that a gauge pressure in excess of 150 pounds per square inch will not result from the use of such a mixture, while stating that the use of pure propane will produce such result.

It is urged on behalf of appellant that, the counts having originated in the Tears patent, they must be construed in the light of the Tears disclosure and all limitations must be carefully observed. This is not a complete statement of the rule. It is the rule that where the counts of an interference, declared between a patent in which they originated and an application, are ambiguous they are to be construed in conformity with the patent, but limitations not expressed in the counts and not clearly inherent in them will not be read into such counts.

Here the counts do not contain the word "pure," nor is the word used anywhere in the Tears specification. Appellant's contention that the word must be read into the counts, like his contention respecting the word "gauge," is based upon technical matters not established by evidence but merely stated in the brief of appellant and disputed in the brief of appellee, the latter saying: "Anyone skilled in the art knows that commercial propane contains some butane and ethane. Robinson's disclosure is addressed to those skilled in the art and he teaches them to use those liquefied hydrocarbon gases which have approximately the boiling point and vapor pressure of propane."

The authorities furnished the court, following the oral argument of the case, defining propane, etc., are not deemed sufficient to justify reading the word pure into the counts.

Certain arguments on behalf of appellant are based upon the "heating" and "heated" features expressed in counts 1 and 2 and, by reference, in count 3. Here again technical arguments are made which are met by technical arguments. Robinson's application discloses a much more comprehensive treatment than is disclosed by Tears, as is pointed out by the tribunals below, an acid treatment as well as a clay treatment being shown by Robinson. Without entering into details respecting the "heating" and "heated" features, we deem it sufficient to say that nothing is presented in the argument for Tears which satisfactorily demonstrates error in the holdings of the tribunals of the Patent Office concerning them.

It may be said that a difference in the teachings of the respective parties is that Tears defines his temperature by the vapor pressure of his solvent while Robinson defines his temperature in degrees Fahrenheit. This difference produces some complexity when the subject matter is being considered by those unskilled in the art, but those skilled in the art, as for example the tribunals of the Patent Office, doubtless are able to compare the two accurately and without difficulty.

There is argument on behalf of appellant, based upon his teaching that the pressure and temperature may vary within wide limits, it being said that in the case of propane and in accordance with the temperature in the system, the pressure may vary between 150 and 1000 pounds. As to this, it seems sufficient to say that the counts themselves are satisfied by any pressure in excess of 150 pounds.

In his brief appellant raises a question as to the operativeness of Robinson's disclosure, a pump not being shown by Robinson between the propane tank and the mixer. No question of operativeness seems to have been raised before the tribunals below, and we find nothing specific to that matter in the reasons of appeal assigned before us. It is insisted on behalf of Robinson that such a pump is unnecessary if sufficient pressure be maintained in the propane tank. We do not feel called upon to consider this question under the circumstances appearing.

For the reasons stated the decision of the board is affirmed.

Affirmed.